CRAIN, Judge.
Certain teachers and employees of the Terrebonne Parish School Board have been and are presently engaged in a dispute with the Terrebonne Parish School Board. After negotiations reached an impasse, the teachers and other School Board employees decided to and at present are participating in a strike and picketing of the School Board property. At present the strike is in its eighth week. Carol Davis, Pauline Fleming, Charlotte Champagne, Chris Wells, Marsha Williams, Paulette Hartman, Sonja Lecompte individually and as officers and members of the Terrebonne Association of Educators and as representatives of employees of the Terrebonne Parish School Board (hereinafter collectively referred to as Teachers) filed a petition in district court seeking injunctive relief and damages against the Parish School Board and individual board members (hereinafter referred to as School Board). The School Board answered the petition and filed a reconven-tional demand seeking to have the Teachers and other School Board employees enjoined from striking, picketing the School Board property, and encouraging other School Board employees from participating in the strike. The trial court denied the requests of both the Teachers and the School Board. From.this judgment the School Board applied to this Court for Supervisory Writs.
APPLICATION OF ANTI-INJUNCTION STATUTE (LA.R.S. 23:821-849) TO PUBLIC EMPLOYEES
In written reasons for judgment the trial court held that a strike by public employees is legal and consequently no injunction could issue. It did not make a specific finding as to the applicability of La.R.S. 23:821-849 to public employee strikes, but refused to issue an injunction even though he appears to hold that irreparable injury is occurring. We reverse the decision insofar as it refuses to issue an injunction on a showing of irreparable injury.
The legislature has limited the authority of state courts to issue injunctions in labor disputes except in certain statutorily prescribed instances. La.R.S. 23:821-849. This legislation, originally enacted by La. Acts 1934, No. 203, §§ 1-13, is referred to as the “Little Norris-LaGuardia Act” due to its similarity in content and purpose to the federal Norris-LaGuardia Act, 29 U.S.C. §§ 101-115. The legislature is silent regarding whether public employees are included within the purview of La.R.S. 23:821-849.
If La.R.S. 23:821-849 applies to public employees then the court would be unable to enjoin the strike and picketing, etc. engaged in by the Teachers.
*486 This court has previously determined that the “Little Norris-LaGuardia Act” does not apply to public employees. Town of New Roads v. Dukes, 312 So.2d 890 (La.App. 1st Cir.1975).[1] In Dukes we found persuasive the United States Supreme Court interpretation of the Norris-LaGuardia Act as being inapplicable to public employees [United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947)].
The Norris-LaGuardia Act (29 U.S.C.A. §§ 101-115) was enacted by Congress in 1932. It restricted the authority of federal courts, with certain narrow exceptions, from interfering in labor disputes by the issuance of injunctions. 29 U.S.C.A. § 101. The stated policy for the legislation is as follows:
Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to' negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....
29 U.S.C.A. § 102 (emphasis ours).
The United States Supreme Court reasoned that this language referred to employers who are organized in corporate form, or other forms for purposes of economic or capital control not the government as employer. It also looked to the statutory definition of a person covered by the act.
A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.
29 U.S.C.A. § 113(b). Therein it determined that the employer contemplated in the definition of a person was a private individual or corporation, not a government.
The determination was also based on a reading of 29 U.S.C.A. § 107(c) which provides that in order for an injunction to be issued in compliance with the provisions of Norris-LaGuardia the Court must make a factual determination that the “public officers charged with the duty to protect complainant’s property are unable or unwilling to furnish adequate protection.” As stated by the Supreme Court:
Obviously, such finding could never be made if the complainant were the United States, and federal property were threatened by federal employees, as the responsibility of protection would then rest not only on state officers, but also on all federal civil and military forces. If these failed, a federal injunction would be a meaningless form.
United Mine Workers, 67 S.Ct. at 687. The Court further reasoned that statutes which divest pre-existing rights or privileges would not be applied to the government absent express words to that effect.
The public policy of the state regarding judicial interference in labor disputes is as follows:
Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employee. Governmental authority has permitted and encouraged employers to organize *487 in the corporate and other forms of capital control. In dealing with such employers the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore, it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.
La.R.S. 23:822 (emphasis ours).
The statutory definition of a “person” involved or participating in a labor dispute is one who is “engaged in the industry, trade, craft, or occupation in which such dispute occurs, or is a member, officer, or agent of any association of employers or employees engaged in such industry, trade, craft, or occupation.” La.R.S. 23:821(2). The circumstances under which an injunction may be issued under La.R.S. 23:844 are almost identical to those under which a federal court is authorized to issue injunctions under 29 U.S.C.A. § 107.
Prior to the enactment of La.R.S. 23:821-849 the state and its political subdivision were able to seek injunctive relief to prevent irreparable harm by its striking employees. The inclusion of public employees within the purview of the “Little Norris-LaGuardia Act” would impair or divest those rights. Under such circumstances the inclusion of the State or its political subdivisions is not presumed unless the legislative intent is clearly stated. Dukes, 312 So.2d at 892. As quoted in Dukes, id.
Neither the government, whether federal or state, nor its agencies are considered to be within the purview of a statute unless an intention to include them is clearly manifested; and the rule applies, or applies especially, to statutes which would impair or divest the rights, title or interests of the government.
C.J.S. Statutes § 317.
Appellees asserted two arguments in favor of their position that La.R.S. 23:821-849 is applicable to public employee strikes. Originally they argued that Dukes is no longer good law because of La. Const. art. X, § 10(A)(3) which provides that state agencies or political subdivisions are not prohibited from contracting with employee organizations “with respect to wages, hours, grievances, working conditions, or other conditions of employment”. The argument was that Dukes prohibited collective bargaining with state employees while such is allowed by the Constitution as well as other jurisprudence of this state. On oral argument appellees conceded that the holding of Dukes is that collective bargaining is not required by the state or its subdivisions which was the law prior to Dukes and is the law after Dukes.[2] However, even though collective bargaining with state employees is permitted, Dukes holds that La.R.S. 23:821-849 does not apply to state employees. Appellees conceded in oral argument that it is necessary to overrule Dukes in order to apply these statutes. We see no reason for doing so with reference to the applicability of the statutes, and as previously noted there are compelling reasons for following Dukes on that primary issue.
Appellees also argued that we are bound by footnote 2 of Charbonnet v. Gerace, 457 So.2d 676 (La.1984), in which the Louisiana Supreme Court stated “Strikes against state, parochial and municipal governments are not statutorily prohibited in Louisiana. Indeed, La.R.S. 23:841 arguably provides unqualified protection of the right to strike.” In Charbonnet federal employees (air traffic controllers) who were members of a labor union and employed by the federal government had been denied *488 state unemployment benefits as a result of their participation in a strike against their employer. The strike was in violation of 5 U.S.C. § 7311 which prohibits strikes against the federal government. The court found that violation of the federal statute did not amount to “willful misconduct” contemplated by the Unemployment Compensation Act, La.R.S. 23:1601. The language in the footnote was in no way necessary to the decision and does not indicate a considered opinion with reference to the applicability of La.R.S. 23:821-849 to public employee strikes. Even the footnote uses the term “arguably”. In fact the Supreme Court appeared to cite with approval City of New Orleans v. Police Association of La., 369 So.2d 188 (La.App. 4th Cir.1979), in which the Fourth Circuit Court of Appeal determined that a strike by police officers against a municipality is illegal because it presents a threat to the public welfare.
After considering the above discussed factors we hold that the “Little Norris-La-Guardia Act”, does not apply to public employees.
APPELLANTS’ RIGHT TO INJUNCTIVE RELIEF ON A SHOWING OF IRREPARABLE INJURY
“An injunction shall issue in cases when irreparable injury, or damage may otherwise result to the applicant ...”. La.C. C.P. art. 3601. In Louisiana as in other states an applicant who seeks to enjoin a defendant from unlawful acts does not have to show irreparable injury. Smith v. West Virginia Oil and Gas Co., 365 So.2d 269 (La.App. 2d Cir.1978), reversed on other grounds, 373 So.2d 488 (La.1979). Consequently, if the strike is illegal it is unnecessary for school board to show irreparable injury. However, assuming only for the purposes of this opinion the legality of the strike, the activity may still be enjoined under La.C.C.P. art. 3601 on a showing of irreparable injury. In discussing termination of strikes in those states which have made strikes statutorily legal the following is noted in Valente, Education Law, Public and Private, at 386 (1989):
Jurisdiction aside, the general standard for terminating a lawfully commenced strike, is harm or danger to public welfare. Unlike the common law, some public inconvenience and disruption is encouraged by strike enabling statutes so that the nature and severity of the inconvenience prohibited by particular statutes rests with judicial construction of legislative intent and judicial discretion in evaluating the impact of each strike.
Our legislature has been deafening in its silence on public employee strikes. Consequently, if we make the assumption that silence legitimates those strikes, which would be contrary to every other state in the Union, we must apply some rules for governance of those strikes. As previously noted in this opinion the anti-injunction statute contained in the Little Norris-La-Guardia Act, La.R.S. 23:821-849, does not apply. This holding accords with the “overwhelming weight of authority [which] holds that public employee strikes are riot subject to barriers of state anti-injunctive statutes.” Valente at pg. 385. The reason is obvious. The possibility of harm to the public is so great in a public employee strike that protection of the general welfare requires the ability to terminate. In the private sector the last recourse of the private employer may be the dissolution of the entity struck. The court simply cannot preside over the dissolution of government or the abdication of essential governmental services contrary to the public welfare. Consequently, assuming the legality of public employee strikes, we find it appropriate to apply the irreparable injury requirement of La.C.C.P. art. 3601 in determining when an injunction should issue to terminate a public employee strike.
From a review of the record of the hearing on the preliminary injunction, this court concludes the School Board has proven irreparable injury is occurring, and will occur in the future, if the injunction is not issued.
Ray LeBoeuf, who is the supervisor of child welfare and attendance, testified that normal attendance has been between 94 and 95.9% in the last year. However, dur *489 ing the strike, the percentage of children in school has been anywhere between a low of 29% to the highest attendance rate of 63%. In his opinion, the low attendance rate was due to the strike. Although he could enforce truancy laws, he felt it would be pointless. A letter had been sent out by the Superintendent of Schools encouraging parents to send their children to school, and that resulted in the increase in attendance from 29 to 63%. He stated he did not pursue compelling attendance, because the teachers who normally supervise the children were not at work. Therefore, the lack of supervision could be potentially dangerous to the children.
Daniel Landry, the supervisor of secondary education, is charged with supervision of curricular and extracurricular activities at the secondary level, grades 7 through 12. He testified that of thirteen or fourteen guidance counselors in the school system, five were on strike. Drug abuse and suicide prevention counseling, as well as career planning and personal counseling, were not being provided to some students because of the strike. This problem has been magnified, because the guidance counselors who are not striking are now teaching classes. He stated that seniors who need preparation for ACT and SAT exams are not receiving assistance for the exams. Further, the first nine weeks exams have passed without any grades having been given. This affects students’ ability to receive college scholarships which are based in part on the grades they were to have received in their senior year.
Everette Walker, supervisor of elementary education, testified that a new reading program had been implemented in the last year at a cost of more than one-half million dollars. The program is based on teaching learning skills in progression, and the benefits of the program will be lost or hampered by the strike. In fact, “major damage has occurred” already because of the strike, and many of the repetitive skills would have to be foregone because of the loss of time.
Dena Cox Yarborough is the director of the special education department. She supervises the exceptional children, both gifted and handicapped, and testified 2,000 of the children are not receiving educational services. One hundred fifty students, including some handicapped 3 to 5 year olds, are not being evaluated, and not receiving special education services. Handicapped children are especially subject to regression when their daily routine is disrupted, as it has been because of the strike.
The School Board’s director of finance, Harris Henry, testified that under normal circumstances, the school system costs about $293,000 per day. During the strike, the cost per day is much less. The reduced cost is approximately $95,000 per day. To make up the lost days, Henry would have to take into consideration several factors, including costs of bus transportation, plant expenses, equipment costs, and pay to personnel, as well as the total cost of retirement paid by the School Board. With these factors taken into consideration, the cost of making up one day of school would be about $260,000. The amount required to make up the first 18 days of the strike equals 2.5 times the cost of operating the schools on one normal day. Therefore, for every 2.5 days missed, the School Board has enough money to operate for one day. Henry testified that his figures depended on several variables, and conceivably the cost could be less than the $260,000 he projected. However, he also testified that it would be very tough to make up the time lost to the strike with the amount of money the School Board was not spending while the strike was on-going.
In light of the evidence presented at the hearing, this court concludes that the School Board has shown irreparable injury caused by the strike. In fact, the harm done by the strike at the time of the hearing below had only increased by the time the hearing was held in our court. At that time, the strike had been on-going for 28 days. The logistics of making up the days missed because of the strike, and the harm caused financially by each day missed, only increases with each day that passes. Ap-pellees argue that the required 180 days of school is still possible through various adjustments in holidays, and summer school, *490 and even after that point various waivers can be sought and obtained as to required teaching days. This is a Wizard of Oz solution to the problem. We find ourselves in agreement with the trial judge, that, “no meaningful instruction is being given to a large percentage of those students who have remained in school. Quite simply there is no public education in the parish at this time.” Simply put, no manner of technical adjustment or waivers can impart to those children who are presently not being taught the knowledge necessary for them to function and progress. Certification of a brain and the knowledge that goes with it might be feasible for a scarecrow in the Land of Oz; it is not for children in Terre-bonne Parish.
Therefore, it was imperative that this court cause the preliminary injunction to be issued and attempt to halt the irreparable injury being caused to the School Board and the students of Terrebonne Parish by the strike. All costs of this proceeding are to be paid by appellees.
REVERSED AND REMANDED.

. Also City of New Orleans v. Police Association of Louisiana Teamsters Local 253, 369 So.2d 188 (La.App. 4th Cir.1979) the court enjoined a police strike as illegal ignoring La.R.S. 23:821-849.

. In fact La. Const. art. 10, § 10(A)(3) was effective on January 1, 1974. Dukes was decided in 1975.