555 So.2d 457 (1990)
Carol DAVIS, Pauline Fleming, Charlotte Champagne, Chris Wells, Marsha Williams, Paulette Hartman, Sonja Lecompte, Individually and as Members of the Terrebonne Association of Educators and as Representatives of a Class of Similarly Situated Employees of the Terrebonne Parish School Board
v.
Roland A. HENRY, Jr., Herman T. Sullivan, Paul W. Fournier, Leroy Lyons, Betty Broussard Blaize, Clark J. Bonvillain, Donald "Don" Duplantis, L.E. Fletcher, Rene J. Domangue, Francis A. Voisin, Rudolph Hargis, Adolph F. Geist, Donald Bourgeois, Marion P. Dupont and the Terrebonne Parish School Board.
No. 89-CC-2787.
Supreme Court of Louisiana.
January 8, 1990.
Louis L. Robein, Jr., Gardner, Robein & Urann, for applicant.
David C. Treen, Charles K. Reasonover, Joseph M. Bertrand, Joanne C. Ferriot, Deutsch, Kerrigan & Stiles, David Arceneaux, Asst. Dist. Atty., Collins C. Rossi, for respondent.
James J. Brady, amicus curiae for Rapides Federation of Teachers.
Charles M. (Larry) Samuel, III, amicus curiae for United Teachers of New Orleans & Jefferson Federation of Teachers.
James S. Burland, amicus curiae for Louisiana Right-to-Work Committee, Inc.
DIXON, Chief Justice.
At issue is whether, under Louisiana law, teachers and other school personnel who are public employees fall within the purview of the "Little Norris-LaGuardia Act" and therefore have the right to engage in a strike in support of their demand for collective bargaining.
On October 18, 1989, approximately seven hundred fifty teachers and two hundred fifty bus drivers, cafeteria workers and janitors employed by the Terrebonne Parish School Board went on strike and began to picket school board property. Various issues concerning wages, hours and working conditions are in dispute, and a stalemate has been reached over the question of whether collective bargaining will take place. The striking employees have said they will not return to work without accommodation *458 on this question, while the school board is apparently firm in its resolve not to recognize the employees' union, the Terrebonne Parish Association of Educators, and not to engage in collective bargaining.
Despite the fact that this strike has now lasted longer than any other in Louisiana history, the board has managed to keep the schools open, using non-striking and replacement personnel. School attendance, which normally runs at 94 to 96%, declined at the beginning of the strike to 29%, then later rose to around 63% after school officials sent parents a letter encouraging them to send their children to school. The trial court found "no meaningful instruction" was being given to a large percentage of the students who do attend. On the other hand, both the school board president and the school superintendent have testified that all statutory minimums pertaining to the delivery of education are being met. The board complains that special classes, including those for the gifted and handicapped, and drug abuse and suicide prevention programs are not being offered. They conceded they have applied for waivers so that government funding will not be revoked for lack of compliance with established requirements but assert that they will be without funds to make up the days missed due to the strike.
After a November 3, 1989 board resolution stating no punitive action would be taken if the striking employees returned to work by November 6, the union representative filed a class action suit, seeking monetary damages and an injunction prohibiting the board from firing any of the employees who are on strike. The board then filed a reconventional demand, seeking a declaratory judgment that the strike is illegal and asking for injunctive relief, barring the employees from engaging in a concerted work stoppage, from picketing school property and from encouraging other employees to participate in the strike. In support of its request for an injunction, the board argues that public employee strikes are per se illegal and that the strike is causing irreparable injury to the district's approximately twenty-one thousand students. The employees, on the other hand, claim they are engaged in lawfully protected activity, the exercise of which the board can not enjoin.
In an attempt to settle the dispute, the district court ordered mediation. Despite a week of daily mediation sessions, the parties remained deadlocked on the issue of collective bargaining. After a hearing in the matter, the district court denied relief to both parties, finding in the absence of statutory prohibition, the strike is legal and hence not enjoinable. The district court also found that the board has denied any intention of firing the striking employees and the employees are hence not entitled to an injunction on the basis of an "inference" of retaliation.
The school board appealed; the teachers did not.
The court of appeal, 555 So.2d 484, reversed and ordered the trial court to grant the injunctive relief sought by the board. Relying on its own prior decision in Town of New Roads v. Dukes, 312 So.2d 890 (La.App. 1st Cir.1975), the court of appeal held public employees are not protected by R.S. 23:821-24, 841-49, the "Little Norris-LaGuardia Act," which prohibits the issuance of injunctions in labor disputes except when there is imminent danger of threat to the public health and safety. Alternatively, the court of appeal concluded that even if public employees do fall within the purview of this act, the board had shown irreparable harm and was hence entitled to an injunction under C.C.P. 3601. The employees then applied to this court and we stayed the judgment of the court of appeal. After hearing oral argument, we summarily reversed the court of appeal's judgment, 553 So.2d 859, and now issue reasons for having done so.
In their brief to this court, the employees have argued that public policy in Louisiana favors non-intervention in all labor disputes and that the "Little Norris-LaGuardia Act" applies to all labor disputes, be they public or private. The board concedes public employee strikes are not prohibited by any Louisiana statute but contends public employee strikes are illegal, based on the common law. Although *459 we have previously considered other issues in the context of public employee strikes, no decision of this court has squarely addressed the question of whether public employee strikes are legal under Louisiana law. A review of the jurisprudence, statutes and constitution shows Louisiana public policy favors the organization of and collective bargaining for both public and private employees. Concomitant with these protected rights is the right to engage in peaceful picketing, work stoppage and other concerted activities. Thus the "Little Norris-LaGuardia Act" is applicable to public school employees, and its provisions, therefore, govern issuance of an injunction in a strike by these employees.

ANALYSIS
In the early part of this century, neither public nor private employees had the right to strike in concert with their fellow workers, such actions being viewed as conspiracy and subject to criminal and civil sanctions. Today, the right to strike is generally recognized as indispensable to the system of collective bargaining and negotiation. Nevertheless, public sector strikes have been treated differently from those of the private sector. Strikes against the federal government are still treated as illegal, while strikes against state and local government have been accepted in only some jurisdictions.[1]
With the decline of the common law rule that concerted action by employees against their employer was illegal and probably criminal, Congress attempted as early as 1914 to limit jurisdiction of the federal courts in labor disputes. Nevertheless, the courts continued to issue labor injunctions. The Norris-LaGuardia Act, enacted in 1932, "was a direct response to judicial encroachment on the national policy which favored the protection of the right of labor unions to function free of governmental interference." Note, "The Court Adds Life to the Little Norris-LaGuardia Act," 27 Loyola L.Rev. 1215, 1216 (1981). Since passage of that act, federal courts have been restrained in issuing injunctions by the requirement that specific findings of fact must be made before issuance of either a temporary or permanent injunction in a labor dispute. 29 U.S.C. § 107.
In 1934, Louisiana enacted its own anti-injunction statute, R.S. 23:821-24, 23:841-49. Patterned after the federal statute, such state anti-injunction statutes are commonly called "Little Norris-LaGuardia Acts." Some jurisdictions specifically excluded the state and its employees from operation of their statute; hence issuance of injunctions against striking public employees in those jurisdictions is permitted upon a showing of irreparable harm. Annotation, "Right of Public Employees to Strike or Engage in Work Stoppage," 37 A.L.R.3d at 1152 (1971). The Louisiana legislature, on the other hand, did not exclude the state, its agencies and political subdivisions when it declared public policy in regard to the freedom of laborers to organize:

"Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employee. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers the individual unorganized worker is helpless to exercise actual liberty *460 of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore, it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." R.S. 23:822. (Emphasis added).
This provision shows a clear legislative intent to protect all employees in the exercise of their right to engage in concerted activities.
As part of the goal of curbing interference by the courts in labor disputes, both the federal and state anti-injunction acts also addressed another abuse which was widespread in the early days of organized labor. Employers, in an effort to prevent strikes, often secured from their employees written agreements, called "Yellow Dog" contracts, whereby the employees promised they would not join unions. Although specific performance of these contracts could not be obtained, compliance was ensured by retaining a portion of the employee's wages as a guaranty to be forfeited if the contract were violated. Bonnett, "The Yellow Dog Contract in its Relation to Public Policy," 7 Tul.L.Rev. 315, 316-17. In order to prevent this abuse, both R.S. 23:823 and its federal counterpart, 29 U.S.C. § 103, provide that contracts whereby employees promise not to join a union are contrary to public policy and "shall not afford any basis for the granting of legal or equitable relief ..."
These policy statements, favoring the freedom of employees to organize and collectively bargain with their employer, could only be effectuated if the courts' ability to interfere in labor disputes was curtailed. Thus it has been provided that no injunction shall be issued against employees engaged in concerted activities.

"No court shall issue any restraining order or temporary or permanent injunction which in specific or general terms prohibits any person or persons from doing, whether singly or in concert, any of the following acts:
(1) Ceasing or refusing to perform any work or to remain in any relation of employment regardless of any promise, undertaking, contract or agreement to do such work or to remain in such employment;
(2) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in R.S. 23:823;
(3) Paying or giving to, or withholding from, any person any strike or unemployment benefits or insurance or other moneys or things of value;
(4) Aiding any person by any lawful means, who is being proceeded against in, or is prosecuting any action or suit in any court of the United States or of any state;
(5) Giving publicity to and obtaining or communicating information regarding the existence of or the facts involved in any dispute, whether by advertising, speaking, patrolling any public street or any place where persons may lawfully be, without intimidation or coercion, or by any other method not involving fraud, violence, breach of the peace, or threat thereof;
(6) Ceasing to patronize or to employ any person or persons;
(7) Assembling peaceably to do or to organize to do any of the acts heretofore specified or to promote lawful interests;
(8) Advising or notifying any person or persons of an intention to do any of the acts heretofore specified;
(9) Agreeing with other persons to do or not to do any of the acts heretofore specified;
(10) Advising, urging, or inducing without fraud, violence, or threat thereof, others to do the acts heretofore specified, *461 regardless of any such undertaking or promise as is described in R.S. 23:823;
(11) Doing in concert of any or all the acts hereto specified on the ground that the persons engaged therein constitute an unlawful combination or conspiracy." R.S. 23:841. (Emphasis added).
Thus the statute provides that all persons are entitled to engage in activities, such as peaceful picketing, refusing to perform work, becoming a member of a union, assembling peaceably to organize, communicating with others in regard to a labor dispute, and encouraging others to do these acts, without fear that they are in violation of the law.
The legislature recognized that sweeping injunctive relief is "peculiarly subject to abuse in labor litigation ..." R.S. 23:843. Hence the court's authority to grant either temporary or permanent injunctive relief in a labor dispute is limited to situations in which it has made factual findings in six specific areas. This statute, which is the heart of the "Little Norris-LaGuardia Act," provides:

"No court shall issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as herein defined,[2] except after hearing the testimony of witnesses in open court, with opportunity for cross-examination, in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court to the effect:

(1) That unlawful acts have been threatened or committed and will be executed or continued unless restrained;
(2) That substantial and irreparable injury to complainant's property will follow unless the relief requested is granted;
(3) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial thereof than will be inflicted upon the defendants by the granting thereof;
(4) That no item of relief granted is relief that a court has no authority to restrain or enjoin under R.S. 23:841;
(5) That complainant has no adequate remedy by ordinary legal procedure; and

(6) That the public officers charged with the duty to protect complainant's property have failed or are unable to furnish adequate protection.
..." R.S. 23:844.
By placing a heavy burden on the complainant, the drafters showed their intent to make it difficult to obtain a labor injunction in Louisiana. As we said in Baton Rouge Coca-Cola Bottling Co., Ltd. v. General Truck Drivers, Warehousemen and Helpers, Local Union No. 5, 403 So.2d 632, 635 (La.1981), injunctions are not prohibited in labor disputes. However, the statutory preclusive procedures and guidelines must be followed before that relief is available.
The school board concedes no Louisiana statute prohibits its employees from striking but contends such strikes are illegal under the common law. An analysis of our jurisprudence demonstrates that public employees possess such a right, with an exception being made for strikes which clearly endanger the public health and safety. Only the decision in Town of New Roads v. Dukes, 312 So.2d 890 (La.App. 1st Cir. 1975), held to the contrary. It is this decision upon which the school board bases its argument and upon which the court of appeal relied in ruling that the Terrebonne Parish School Board is entitled to an injunction. Dukes, in essence, held that the failure of the "Little Norris-LaGuardia Act" to expressly include the state and its employees signifies a lack of intent that the statute apply to the state. This holding is an aberration in our law and, for reasons which follow, we find the decision was in error and is hereby overruled.
*462 Prior to the enactment of the 1974 Constitution, it was unclear whether public employees in Louisiana were entitled to organize. One of the earliest decisions in which the point was raised was Zbozen v. Department of Highways, 293 So.2d 901 (La.App. 1st Cir.1974). In that case, employees of the Department of Highways sought to block enforcement of a contract entered into upon their behalf by a union minority. The court agreed with the plaintiffs that they had not authorized the union to represent them, since the plaintiff employees constituted some 60% of the department's workforce. The court thus enjoined enforcement of the contract. The plaintiffs also sought to enjoin the union from acting as collective bargaining representatives for the department employees who were union members. Both the trial court and the court of appeal denied this injunction, since there was no provision of law prohibiting governmental agencies from recognizing collective bargaining agents of its employees. As the First Circuit said, "In the absence of positive law prohibiting recognition of such collective bargaining agents for union-member employees, there is no basis for enjoining such action." Id. at 904. In Dukes, which also involved an absence of prohibition, the First Circuit came to the opposite conclusion.
Another early decision in this area of public employee labor law was Louisiana Teachers' Association v. Orleans Parish School Board, 303 So.2d 564 (La.App. 4th Cir.1974), where the court had to decide whether a school board could collectively bargain with its employees or whether such bargaining involved an unlawful delegation of the board's power. In the absence of clear legislative directive[3] and given the board's authority to hire teachers, fix their salaries, and determine the number and location of schools, the court concluded the board had implied authority to engage in collective bargaining. The court said:
"The expressed public policy of Louisiana encourages self-organization by employees and collective bargaining in the private sector. R.S. 23:822. We see no reason founded on public policy why collective bargaining should not be allowed in the public sector ..." 303 So.2d at 567.
Shortly after these decisions, the new Constitution took effect on December 31, 1974. Any doubt as to whether public employees in Louisiana were free to organize was removed by this provision:
"(3) ... No rule, regulation, or practice of the [Civil Service] commission, of any agency or department, or of any official of the state or any political subdivision shall favor or discriminate against any applicant or employee because of his membership or non-membership in any private organization; but this shall not prohibit any state agency, department, or political subdivision from contracting with an employee organization with respect to wages, hours, grievances, working conditions, or other conditions of employment in a manner not inconsistent with this constitution, a civil service law, or a valid rule or regulation of a commission." La. Const. of 1974, art. 10 § 10(3). (Emphasis added).
This provision establishes that, as part of the state's labor policy, public employees are protected from discrimination because of their relationship with a labor organization. Likewise, the provision makes clear that state agencies and political subdivisions are free to bargain with employee organizations. Thus, with the passage of this provision, public employees became constitutionally entitled to the same right to engage in collective bargaining as held by their counterparts in the private sector. The constitutional provision took effect shortly before Dukes was handed down.
Yet another policy statement involving the rights of labor was made by the legislature in 1976, with enactment of the "Right to Work" law, which provides:
"It is hereby declared to be the public policy of Louisiana that all persons shall *463 have, and shall be protected in the exercise of the right, freely and without fear of penalty or reprisal, to form, join and assist labor organizations or to refrain from any such activities." R.S. 23:981. (Emphasis added).
In passing this act, the legislature did not limit the right to participate in labor organizations to certain classes:
"The term `labor organization' means any organization of any kind, or agency or employee representation committee, which exists for the purpose, in whole or in part, of dealing with employers concerning wages, rates of pay, hours of work or other conditions of employment." R.S. 23:982. (Emphasis added).
Another judicial contribution to public employee law was City of New Orleans v. Police Association of Louisiana, Teamsters Local No. 253, 369 So.2d 188 (La.App. 4th Cir.1979), where the court ruled that police strikes are illegal.[4] In dicta, the court observed that in the absence of a statute governing the question, many states have held public employees have no right to strike, citing 37 A.L.R.3d 1147, 1156-57. This prohibition stems from the common law rule which gave the sovereign the right to prohibit strikes by public employees. Modern rules which perpetuate the prohibition of all public employee strikes, either by statute or judicial decision, simply incorporate or reassert the common law rule. 37 A.L.R.3d at 1150. Louisiana is not a common law jurisdiction, and common law jurisprudence is not binding in this state. See La. Const., art. 3 § 15(B): "... No system or code of laws shall be adopted by general reference to it."
City of New Orleans v. Police Association of Louisiana, supra, meanwhile did not answer the broad question of whether any public employee in Louisiana has the right to strike. Its more narrow holding was that a strike by police officers must be prohibited. The court reasoned:
"In the case of a police strike, the concerted refusal to work by the peace-keeping employees of the government not only leaves society defenseless against crime but even inspires lawlessness.
No comparable harm can come to society in the case of a strike against ordinary private business. Striking employees of a private business can bring their employer to his knees without endangering the public health and safety, while striking police officers cannot.
More swiftly and surely than any other, a strike by law enforcement officers takes law enforcement and consequently the rule of law itself from our society. A police strike begins as anarchy and leads towards terrorism." 369 So.2d at 189.
The court noted that even though the AFL-CIO takes issue with a blanket prohibition of public employee strikes, that organization nevertheless concedes that police and other law enforcement personnel should be denied the right to strike. This view is the prevailing one. In jurisdictions where statutes specifically allow most public employees to strike, strikes by police, fire and hospital personnel, as well as employees of correctional institutions, are considered to pose such a threat to the public health and welfare that they are outlawed. County Sanitation District v. Los Angeles County Employees' Association, supra 214 Cal. Rptr. at 431, 699 P.2d at 847.
The decision in City of New Orleans v. Police Association of Louisiana, supra, while holding at least some public employee strikes are illegal, demonstrates an unwillingness to uniformly deny public employees the right to strike. As the court noted, the difference between a strike by police and by museum employees is obvious. "Society can tolerate the temporary closing of a museum, but not the suspension of law." 369 So.2d at 190.
*464 In decisions by this court, the legality of public employee strikes has been only peripherally at issue. In Charbonnet v. Gerace, 457 So.2d 676 (La.1984), we were faced with the question of whether the federal government had shown that its employees, striking air traffic controllers, had engaged in willful misconduct sufficient to bar their entitlement to workers' compensation benefits. The strike in which the controllers participated was illegal under federal statute,[5] yet we concluded the government had failed to show misconduct because the controllers believed they had the legal right to strike once their contract had expired. In the course of our decision, we observed: "Strikes against state, parochial and municipal governments are not statutorily prohibited in Louisiana. Indeed, La. R.S. 23:841 arguably provides unqualified protection of the right to strike." Id. at 678 n. 2
More recently, two decisions involving Louisiana teacher strikes addressed other issues but, significantly, did not raise the question of the legality of the strikes. In St. John the Baptist Parish Association of Educators v. Brown, 465 So.2d 674 (La. 1985), school board officials were faced with a group of employees seeking, as are the plaintiffs here, collective bargaining. After a forty day work stoppage, the board and its employee teachers agreed to end the strike by entering an agreement whereby the question of whether collective bargaining would take place would be submitted to the voters. When the Secretary of State refused to place a referendum to this effect on the ballot, the school employees filed suit against the state. The lower courts ordered the secretary to place the issue on the ballot and the state appealed. This court ruled that a school board has no authority, either under the statutes or the constitution, to refer a decision to the electorate, and restated the rule that a school board has "the authority, with or without popular approval, to bargain collectively with its teachers." 465 So.2d at 677-78. For our purposes, the significance of the decision lies in the fact that the legality of the strike was apparently not at issue.
Neither was the question of legality addressed in St. John the Baptist Parish Association of Educators v. St. John the Baptist Parish School Board, 494 So.2d 553 (La.App. 5th Cir.1986). In that case, teachers had been involved in a strike which lasted from August until late October of 1984. As part of the strike settlement agreement reached by the board and the striking employees, a promise of fair treatment and no reprisals for participation in the strike was made. The board also agreed that if post-strike reduction in force became necessary, replacement teachers hired during the strike would be laid off first, while further layoffs would be made on the basis of seniority. These provisions became part of the contract accepted by the teachers in settlement of the strike. A few months later, when layoffs became necessary, the board adopted a revised schedule of layoff priority, penalizing those who struck by awarding "super-seniority" to nonstriking employees despite its earlier commitment. The court of appeal required the board to abide by the layoff agreement incorporated into the contract it had entered in ending the strike. We again find it significant that, as with the earlier St. John the Baptist Parish decision, the court of appeal never suggested the strike was illegal.[6] Instead the court summarily found the teachers, who had been on strike for nearly two months, had been "engaged in a lawful strike and work stoppage ..." 494 So.2d at 555.
As these decisions and the Constitution and statutes show, with the exception of strikes by police and the contrary holding in Dukes, strikes by public employees in Louisiana have customarily been treated as legal. We disagree with Dukes' assertion that the legislature has been silent on this question, but rather find under our law an intent to afford public employees a system *465 of organizational rights which parallels that afforded to employees in the private sector. The specter of strike, with its attendant hardships, can provide impetus for parties to agree at the bargaining table; hence the credible threat of strike may serve to avert, rather than encourage work stoppages.[7]
The First Circuit's earlier decision in Dukes involved picketing, work stoppage and alleged violence by public employees who sought recognition from and collective bargaining with their employer, the Town of New Roads. The district court issued a temporary restraining order of the strike and defendants were charged with having violated that order. The defendants then moved to have the contempt proceedings transferred to the criminal docket for jury trial, in accord with R.S. 23:848.[8] The trial court refused to grant the defendants' motion, finding the plaintiff town was not an "employer" within the meaning of R.S. 23:821 et seq., and that the "Little Norris-LaGuardia Act" was inapplicable to political subdivisions of the state. The court of appeal affirmed, applying a rule of construction that holds "statutes which in general terms divest pre-existing rights and privileges will not be applied to the sovereign without express words to that effect." Town of New Roads v. Dukes, supra at 893, citing United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Relying on this rule, the court of appeal held the state was not an employer "within the terms and intendment of R.S. 23:821 et seq., and that R.S. 23:848 thus did not apply to the contempt proceedings before it." 312 So.2d at 895. As we noted above, no such rule was applied in Zbozen v. Department of Highways, supra.[9]
The Dukes court followed the reasoning of United States v. United Mine Workers of America, supra. U.M.W., decided in 1947, was a contempt proceeding against John L. Lewis and the United Mine Workers. Pursuant to his wartime powers, the President had seized the coal mines; the work terms of the miners, who until then had been private employees, was thereafter controlled by an agreement entered into by the government and Lewis, on behalf of the miners. A dispute over a wage agreement later arose. When negotiations did not produce a settlement, Lewis gave unilateral notice that he was terminating the agreement. The United States sought a declaratory *466 judgment, alleging the notice of termination was essentially a strike notice, and asked for injunctive relief. Without notice, a temporary restraining order was issued. The miners walked out, and the United States filed a rule for contempt. The defendant miners filed a motion challenging the jurisdiction of the court, arguing the Norris-LaGuardia Act deprived the court of jurisdiction. This motion was denied and the defendants were found guilty. The Supreme Court took the case on certiorari, believing prompt settlement was in the national interest.
Justice Vinson's plurality opinion was joined by two other justices (Reed and Burton). Justices Black and Douglas joined in holding that neither the Clayton Act nor the Norris-LaGuardia Act withdrew from the government, in a dispute with its own employees, the right to employ injunctions as a remedy, and that the district court retained jurisdiction of the case. In part, the decision was based upon the rule cited in Dukes, that "statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect." 330 U.S. at 272, 67 S.Ct. at 686. Since the act did not define the "persons" affected, the term did not include the sovereign. 330 U.S. at 275, 67 S.Ct. at 687.
Justice Jackson agreed in finding the defendants guilty of contempt, but thought the Norris-LaGuardia Act "relieved the courts of jurisdiction to issue injunctions in this class of case." 330 U.S. at 307, 67 S.Ct. at 703. Seven of the justices (Vinson, Reed, Burton, Jackson, Frankfurter, Black and Douglas) agreed that whether or not the Norris-LaGuardia Act divested the court of jurisdiction, the district court had power to find defendants guilty of contempt in violation of its order while it adjudicated the exception to the court's jurisdiction. Two of the Justices, Rutledge and Murphy, would have held the Norris-LaGuardia Act applied and would have found the district court without jurisdiction to enjoin the strike and without jurisdiction to find the defendants in contempt.
U.M.W. is relevant in this case only because the Norris-LaGuardia Act was found to be inapplicable in cases involving disputes between the United States government (the "sovereign") and its employees (mine workers in formerly private coal mines seized by the government under its wartime powers). The argument made here is that the "Little Norris-LaGuardia Act" is not applicable in a dispute between a school board and its teachers.
The two situations are completely different. Neither the school board nor the state is the "sovereign." The rule of statutory construction applied by the court in Dukes and in U.M.W. has the same origin as the doctrine of "sovereign immunity" in tort law, that is in the relation between the Crown and Parliament in 18th Century England. The rule was long used to defeat government liability for the negligent acts of its employees, yet was widely criticized for its unjust results and irrational basis. Anderson Federation of Teachers, Local 519 v. School City of Anderson (DeBruler, C.J., dissenting), supra. The doctrine of sovereign immunity has been abrogated in Louisiana. Const.1974, art. 12, § 10; Board of Commissioners of the Port of New Orleans v. Splendour Shipping & Enterprises Company, Inc., 273 So.2d 19 (La.1973).
We further note the Supreme Court itself said of this rule of construction that it:
... is an aid to consistent construction of statutes of the enacting sovereign when their purpose is in doubt, but it does not require that the aim of a statute fairly to be inferred be disregarded because not explicitly stated." United States v. California, 297 U.S. 175, 186 [56 S.Ct. 421, 425, 80 L.Ed. 567] (1935).
That statement comports with our Civil Code, which provides:
"When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." C.C. 9.
See also our holding in Stafford v. City of Baton Rouge, supra.
*467 Two issues were decided in the U.M.W. case. The first was whether the government was subject to the Norris-LaGuardia Act. Five justices ruled that it was.[10] That finding, however, was not essential to the case because seven justices agreed that whether or not the Norris-LaGuardia Act applied, the district court had jurisdiction to decide the case. Thus, the district court had the right to maintain the status quo until it decided the jurisdictional question. Except for policy reasons, the court needed to go no further.
Moreover, the majority in the U.M.W. case relied heavily on the legislative history of the Norris-LaGuardia Act of 1932. The concurring and dissenting opinions relied on the legislative history of the War Labor Disputes Act of 1943 to show Congress strongly opposed the use of injunctions in labor disputes, even as to government.
There is no legislative history of the Louisiana act involved. This court considered its application in 1981 in Baton Rouge Coca-Cola Bottling Co., Ltd. v. General Truck Drivers, Warehousemen and Helpers, Local Union No. 5, supra, and held the act was applicable and that it was not an unconstitutional denial of due process nor an infringement on the jurisdiction of the courts.
The plain words of the statute require application of the "Little Norris-LaGuardia Act" to this dispute. The teachers are employed by the school board. There is a labor dispute between them.
"(3) The term `labor dispute' includes any controversy concerning terms or conditions of employment or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee." R.S. 23:821(3).
School boards can sue and be sued. Const. of 1974, art. 12, § 10; R.S. 13:5105 et seq.; R.S. 17:51. School boards can enjoin and be enjoined. Tate v. Livingston Parish School Board, 391 So.2d 1240 (La.App. 1st Cir.1980).
Under the terms of the "Little Norris-LaGuardia Act," the Terrebonne Parish school employees can be enjoined only in accord with R.S. 23:844, Coca-Cola Bottling Co, Ltd. v. General Truck Drivers, Warehousemen and Helpers, Local Union No. 5, supra. The lower courts here made no factual findings, as required under R.S. 23:844, and there have been no allegations of the type of danger to the public health and safety set out in the statute. Under the act, peaceful picketing, refusal to work, communicating with others concerning a labor dispute and encouraging others to participate in a work stoppage, acts which the court of appeal ordered enjoined, are not enjoinable.
We do not suggest in this opinion that the right to strike is unlimited or unqualified. See City of New Orleans v. Police Association of Louisiana, supra. In a recent decision, the California Supreme Court decided that a strike by public sanitation workers was legal. In applying a statutory scheme which, like that of Louisiana, creates for public employees a system of rights and protections which closely mirrors those in the private sector yet which fails to address the legality of public sector strikes, the court abandoned the common law rule holding that such strikes are per *468 se illegal. Instead, the court applied the "essentiality" analysis and adopted the following test:
"... strikes by public employees are not unlawful at common law unless or until it is clearly demonstrated that such a strike creates a substantial and imminent threat to the health or safety of the public. This standard allows exceptions in certain essential areas of public employment (e.g., the prohibition against firefighters and law enforcement personnel) and also requires the courts to determine on a case-by-case basis whether the public interest overrides the basic right to strike." County Sanitation District No. 2 of Los Angeles County v. Los Angeles County Employees, Local 660, supra [214 Cal.Rptr. at 434, 699 P.2d] at 850.[11]
We believe such a standard is appropriate. However, in light of the Louisiana legislature's failure to establish which classes of public employees are entitled to strike, we may only proceed on a case-by-case basis. We thus reaffirm the holding in City of New Orleans v. Police Association of Louisiana, supra, finding it reasonable that police strikes should be barred under all circumstances given the risk they pose to the public health and safety. We find no such threat of imminent danger in the case of a strike by school employees and, therefore, relying on the statutes, the Constitution and jurisprudence, hold the strike by employees of the Terrebonne Parish School Board is subject to the terms of the "Little Norris-LaGuardia Act."

DECREE
We affirm our earlier order, reversing the court of appeal and rendering judgment in favor of Carol Davis, the Terrebonne Association of Educators et al., defendants in reconvention, and against Roland A. Henry, Jr., the Terrebonne Parish School Board, et al., plaintiffs in reconvention, dismissing the reconventional demand for injunction, at the cost of plaintiffs in reconvention. We hold that the "Little Norris-LaGuardia Act" is applicable to the state and its political subdivisions, including local school boards, and that the courts' jurisdiction to enjoin a strike by school employees is limited by the provisions set out in R.S. 23:844.
LEMMON, COLE and MARCUS, JJ., concur.
NOTES
[1] When California decided that public employee strikes which posed no danger to the public health and safety were legal under the common law, County Sanitation District No. 2 of Los Angeles County v. Los Angeles County Employees Association, 38 Cal.3d 564, 214 Cal.Rptr. 424, 427, 699 P.2d 835, 838 (Calif.1985), eleven other states had already approved of strikes in the public sector. These states included Alaska, Hawaii, Idaho, Illinois, Minnesota, Montana, Ohio, Oregon, Pennsylvania, Vermont and Wisconsin.

The growth of unions in the public sector in the 1960's and 70's essentially paralleled what occurred in the private sector in the 1930's. The growth of labor organization in the public sector was delayed due to restrictive legislation governing organization; such legislation has now been ruled unconstitutional. In addition, public employee strikes were almost universally prohibited. These restrictions on public sector organization were supported by the common argument that collective bargaining in the public sector involved an unlawful delegation of government sovereignty. Comment, "Public Employee Labor Organization," 21 Loyola L.Rev. 911-13 (1975).
[2] R.S. 23:821(3) broadly defines "labor dispute" as "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interest of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee."
[3] In a footnote, Judge Lemmon, citing R.S. 42:457, observed that public employee bargaining in Louisiana was arguably recognized since statutory provision had been made for government employees to authorize their employer to withhold union dues from their salaries. 303 So.2d at 568 n. 4.
[4] In an earlier decision, Tassin v. Local 832, the National Union of Police Officers of the AFL-CIO, 311 So.2d 591 (La.App. 4th Cir.1975), the court of appeal, in a three-two decision, upheld the right of police to peacefully picket city officials' private businesses. The two dissenting judges agreed police had the right to peaceful picketing but would have restricted such pickets to the area of city hall or to city streets.
[5] Federal Employees are barred by statute from striking against the government. 5 U.S.C. § 7311 (1966). Further, participation in such a strike is a felony. 18 U.S.C. § 1918 (1966).
[6] Had the strike been illegal, the board theoretically could have argued the settlement agreement itself was invalid and hence not enforceable. Apparently, no such argument was raised.
[7] In dissenting from a holding that the "Little Norris-LaGuardia Act" was inapplicable to a teachers' strike, Anderson Federation of Teachers, Local 519 v. School City of Anderson, 252 Ind. 558, 251 N.E.2d 15 (1969), DeBruler, C.J., said school board discretion may lead to a wide scope of arbitrary and unfair actions which teachers can avoid only if they have effective means of pressuring the board into good faith bargaining. In addition, teachers have legitimate interests and can offer valuable expertise in deciding questions concerning the running of schools. Id. at 20.

Without the right to strike public employees have no negotiating strength, a situation which leads to frustration and which exacerbates labor/management conflict. County Sanitation District v. Los Angeles County Employees' Association, supra 214 Cal.Rptr. at 431, 699 P.2d at 847. Where public employee strikes are outlawed by statute, such strikes are actually more likely to occur, for the prohibition makes the "march to jail a martyr's procession and a badge of honor for union leaders ..." Kheel, "Strikes and Public Employment," 67 Mich.L.Rev. 931, 936 (1969).
[8] "In all cases where a person shall be charged with indirect contempt for violation of a restraining order or injunction issued by a court under this Part, the accused shall enjoy:

. . . . .
(3) The right to remove the said proceeding to the criminal docket for a speedy and public trial by an impartial jury ..." R.S. 23:848(3).
[9] Indeed, application of such a rule of construction has not been customary in Louisiana. See Stafford v. City of Baton Rouge, 403 So.2d 733, 734 (La.1981), wherein we held that a statute pertaining to the duty of an employer to pay wages due a discharged employee applied to the state. We said:

"... the Legislature, although expressly recognizing this special need of all employees to receive wages due him immediately upon discharge or termination, has not seen fit to distinguish between governmental and private employers in imposing the obligation upon employers to pay immediately the wages due upon cessation of employment. We decline to imply that the Legislature intended such a distinction, and we have not been shown any rational basis for a constitutional classification if the Legislature did intend to distinguish between employers."
[10] More recently, the Supreme Court has apparently indicated that public ownership of services does not make them so essential that employees are denied the right to strike. In United States v. Transportation Union v. Long Island Railway, 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982), the Supreme Court held that employees of what was a private railroad before it was acquired by the government retained their right to strike. This holding suggests that public takeover did not change the rights of the employees, whose services became no more essential once they came under government control. This decision underscores the theory that the nature of the services determines their essentiality and impact of disruption on the public welfare, rather than a simplistic determination that the services are public. County Sanitation District No. 2 of Los Angeles County v. Los Angeles County Employees' Association, Local 660, supra 214 Cal.Rptr. at 430, 699 P.2d at 846.
[11] This distinction, not on the basis of whether the striking employees work for a public or private entity, but on the basis of the "essentiality" of the services offered by the striking public employees, has been urged by commentators who argue against a per se finding of illegality of public employee strikes. Note, "Teachers' StrikesA New Militancy," 43 Notre Dame Lawyer 367, 385-87 (1968); Lieberman, "Teachers' Strikes: Acceptable Strategy?" 46 Phi Delta Kappan 237 (1965).

While teachers' services are certainly more important than those of public golf course workers or gardeners, their work does not entail the protection of the physical welfare of the country. 43 Notre Dame Lawyer at 385. A major difficulty with the public-private distinction is the fact that private strikes can often interfere severely with public services yet these strikes are not enjoinable. "[T]here is not much logic in permitting teamsters to close a school by not delivering coal to it but not permitting teachers to close it by refusing to teach." Lieberman, 46 Phi Delta Kappan at 238. It has been suggested that a compelling reason why public employee strikes have historically been disfavored is that it is more convenient, less costly and easier to bargain with employees who do not have the right to strike than those who do. 43 Notre Dame Lawyer at 386.